Hon. David Axelrod Commissioner New York State Department of Health
You have requested an Attorney General's opinion as to whether Part 18 of the State Sanitary Code applies to race meetings conducted by the New York Racing Association (NYRA) at which attendance is likely to exceed 5,000 persons.
Your letter states that although NYRA's racetracks attract more than 5,000 patrons at each meet, NYRA has consistently contended that it is subject only to the jurisdiction and regulation of the Racing and Wagering Board. NYRA contends that Public Health Law, § 225
(5) (r), which along with Part 18 of the State Sanitary Code authorize the Public Health Council to establish regulations with respect to emergency medical services at public functions likely to attract 5,000 or more people, does not apply to its race meetings.
The New York Racing Association, Inc., which operates the Aqueduct, Belmont Park and Saratoga thoroughbred tracks in New York State, operates under a franchise granted by the New York State Racing and Wagering Board. Established pursuant to section 202 of the New York Racing, Pari-Mutuel Wagering and Breeding Law, and formed under the aegis of the Board, it was organized for the purpose of conducting races and race meetings, improving racing facilities, increasing the conveniences available to patrons, serving the best interest of racing generally and improving the breed of horses. The statute, along with the Rules and Regulations of the New York State Racing and Wagering Board, promulgated pursuant thereto (9 NYCRR §§ 4000.1, et seq.), regulate NYRA's operations.
The Board, on the other hand, was created in July, 1973 within the Executive Department. Under subdivision 1 of section 101 of the Racing, Pari-Mutuel Wagering and Breeding Law, the Board exercises "general jurisdiction over all horse racing activities and all pari-mutuel betting activities, both on-track and off-track, in the state and over the corporations, associations, and persons engaged therein", and is empowered to prescribe rules and regulations for the effective control of horse racing (Equine Practitioners Assn., Inc. v New York State Racingand Wagering Board, 105 A.D.2d 215 [1st Dept, 1984]). All the powers, duties and functions of the various racing and pari-mutuel betting commissions were transferred to the Board (Racing, Pari-Mutuel and Breeding Law, § 101), and the commissions thereafter remained its advisory bodies (§ 103). Included in this broad grant of jurisdiction are its powers to regulate and supervise generally the running of horseraces and to prescribe rules and regulations for the effective control thereof in furtherance of which, it has enacted a comprehensive array of regulations (see 9 NYCRR §§ 4000, et seq.). Thus, the Board exercises extensive control over the conduct of races.
The Board has also sought to protect the health of patrons at racetracks in the State. It has provided for the erection of "at least one temporary hospital in the grandstand area and at least one temporary hospital in the administration building, each providing not less than six beds, equipped with such first aid appliances and material as shall be approved by the commission; [along with] the attendance of competent physicians and registered nurses thereat during racing hours" (9 NYCRR § 4003.24). These regulations were promulgated in 1974.
In 1913, the Legislature created the Public Health Council, a component of the Department of Health and consisting of the Commissioner and fourteen appointees of the Governor, and endowed it with broad interstitial authority to regulate matters affecting the public health (L 1913, ch 559). Specifically, under section 225 (1) of the Public Health Law, as now codified, the Public Health Council is statutorily authorized, at the Commissioner's request, to "consider any matter
relating to the preservation and improvement of public health" (emphasis added). The Public Health Council is further authorized to establish, subject to the Commissioner's approval, sanitary regulations, to be known as the Sanitary Code of the State of New York (§ 225 [4]) which may "deal with any matters affecting the security of life or health or the preservation or improvement of public health in the state . . . and with any matters as to which the jurisdiction is conferred upon the public health council" (§ 225 [5] [a]; emphasis added). In 1973, subsection (r) of the statute was added providing that the Sanitary Code may "establish regulations in respect to emergency medical treatment, equipment and services at public functions likely to attract 5,000 or more people, taking into consideration, differences in type, size and duration of the function, composition of audience, and accessibility and adequacy of emergency health facilities in the vicinity". Thereafter, and in pursuance thereto, Part 18 of the Sanitary Code was adopted, setting forth the requirements for the requisite emergency medical services (10 NYCRR §§ 18.1-18.6).
Under Part 18, no person may promote or hold a public function likely to attract 5,000 or more people unless a permit has been issued for the function (10 NYCRR § 18.3). As to public functions attended by 5,000 to 15,000 people, there must be one emergency health care facility on site staffed by a minimum of two emergency medical technicians; an ambulance staffed by at least one emergency medical technician; and the services of a physician must be available to the site within 15 minutes (id., § 18.4 [a]). For public functions to be attended by 15,000 to 30,000 persons there must be two emergency health care facilities on site, each staffed by two emergency medical technicians; one ambulance on site, staffed by at least one emergency medical technician; and the services of a physician must be available to the site within 15 minutes (ibid.). As to public functions to be attended by 30,000 to 50,000 persons, there must be two emergency health care facilities on site, each staffed by two emergency medical technicians; two ambulances on site, each staffed by at least two emergency medical technicians; and a physician on site (ibid.). For events in the above three categories, documentation must be provided showing that local, municipal and public safety officials, including police, fire and local emergency medical services personnel have been advised of the event in writing (ibid.). For public functions attended by over 50,000 persons, there must be two emergency health care facilities on site, each staffed by two emergency medical technicians; three ambulances on site, each staffed by at least one emergency medical technician; and a physician on site (ibid.). Additionally, a written statement must describe the impact of the event on public safety and emergency medical services in the area, which must include comments by local police, fire, local emergency medical services personnel and other public safety officials (ibid.). Ambulances at all of these events must be designed, equipped and staffed in accordance with applicable regulations to provide emergency medical services during transit (id., § 18.1 [f]). The Code further delineates the minimum equipment requirements to be available at each emergency health care facility. The categories of equipment that must be provided are: patient transfer equipment; airway, ventilation, oxygen and suction equipment; immobilization equipment; wound dressings; and other miscellaneous equipment (id., § 18.2). Each of these categories includes an extensive and detailed list of equipment that must be provided in each health care facility.
It seems clear from the legislative history, the provisions of the statute, and the provisions of Part 18 that the regulations were intended to apply to all public functions likely to attract 5,000 or more people. Subsection (r) of section 225 (5) of the Public Health Law was enacted in response to the Governor's request that the State Department of Health and the Public Health Council "study the whole area of emergency health facilities at large public functions" (L 1973, ch 465, Legislative Bill Jacket, May 21, 1973 letter from Donald A. MacHarg, Counsel, Department of Health to the Counsel to the Governor). In furtherance thereof, the Legislature provided for the Sanitary Code to "establish regulations [with] respect to emergency medical treatment, equipment and services at public functions likely to attract 5,000 or more people" (Public Health Law, § 225 [5] [r]). Thus, a comprehensive approach to the provision of emergency health care at large public gatherings was envisioned by the Governor and the Legislature. This is evident in the legislative history which indicates that the bill "would ensure the availability of appropriate emergency medical treatment, equipment and services at all types of paid public functions" (L 1973, ch 465, Legislative Bill Jacket, Budget Report on Departmental Legislation; emphasis added). Also, by its plain terms, Part 18 covers all public functions including NYRA race meets at which attendance is likely to exceed 5,000 persons.
In our view, the Racing, Pari-Mutuel Wagering and Breeding Law and regulations thereunder are not controlling with respect to race meet emergency health care. Indeed, this law contains no provision expressly granting to the Racing and Wagering Board exclusive jurisdiction over patron health concerns at race meets. Nor is there a detailed and comprehensive scheme in the racing law or in the Board's regulations dealing with health care of race meet patrons (see New York State ClubAssn. v City of New York, 69 N.Y.2d 211, 217, affd ___ US ___,108 S Ct 2225
[1988]; Jancyn Mfg. v Suffolk County, 71 N.Y.2d 91, 98 [1987]). The mere fact that the Board's regulations deal with health matters does not grant it exclusive jurisdiction (id.).
It seems clear that the legislative intent in authorizing Part 18 was to require specific emergency health facilities at all covered public functions. Further, the regulatory scheme enacted in the Code is far more comprehensive and detailed than that contained in the regulations of the Board. The Board has provided only for first aid treatment of patrons and does not require the presence of ambulances other than one man ambulance and one horse ambulance to be placed at the entrance of each racing strip, apparently in the event of injury to a jockey or a horse (9 NYCRR § 4003.23). In contrast, the recently revised Sanitary Code requires medical supplies and services for emergency treatment of attendees and requires ambulances on site. Further, staffing levels at health care facilities are defined and the level of services available is tailored to the size of the gathering.
In sum, there is no basis for the view that the regulations of the Racing and Wagering Board control the provision of patron health care at NYRA race meets. These regulations are very limited in their scope. The more comprehensive and detailed provisions of the State Sanitary Code represent a State-wide resolution of the need for uniformity in provision of emergency health care at large public gatherings. It appears that in complying with the more comprehensive provisions of the Sanitary Code, NYRA racetracks would also meet the less stringent Racing and Wagering Board regulations.
We conclude that Part 18 of the State Sanitary Code applies to race meetings conducted by the New York Racing Association at which attendance is likely to exceed 5,000 persons.